[No. 1520.]

### R. HARRIS *v.* THE STATE.

1. THEFT—PRACTICE—EVIDENCE.—Note the opinion *in extenso* for evidence in a theft case which, however strong to authorize suspicion of the defendant's criminal connection with the stolen animal, is abundantly met and overthrown by his explanation of that connection.

2. SAME.—When, in a prosecution for theft, the defendant has submitted a reasonable explanation of his apparent guilty connection with the offense charged, the burden is upon the State to disprove it in order to authorize a conviction.

3. SAME.—Whether or not the defendant in this case, when his connection with the stolen animal was first challenged, was called upon for an explanation, does not appear. But even if he was, and failed to give it, he was not thereby deprived of the right to prove facts showing that his connection with the stolen animal was an innocent one.

4. SAME—CONTINUANCE.—See the opinion for circumstances under which a continuance should have been awarded.

5. FACT CASE—EVIDENCE.—See the opinion for evidence *held* insufficient to support a conviction for the theft of cattle.

APPEAL from the District Court of Brown. Tried below before the Hon. W. A. Blackburn.

The indictment in this case was joint against the appellant and one Hill, and charged the theft of one head of cattle, the property of A. Crumb. A severance being had, Hill was first tried and convicted. The conviction of the appellant was the result of his subsequent trial, and he was awarded a term of two years in the penitentiary as his punishment.

The opinion of the court sufficiently discloses the evidence.

The motion for a new trial comprehended a large number of grounds, including those involved in the opinion.

*Mathews, Wilkes & Wood,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for the theft of one head of cattle, the property of A. Crumb. The defendant, Harris, and one Hill, son-in-law of Harris, were jointly indicted for this offense. Hill was first tried and convicted. Harris was, of course, tried alone.

In the spring of 1877, Crumb owned a cow and calf, the brand of the cow being CRUM, on the left side, and her mark being a crop and under half-crop in each ear. The calf was neither marked nor branded. The range of the cow was in the neighborhood of a round mound in Pecan valley, in Brown county. In the spring of 1878 the cow was driven home by Crumb's son. The calf was not recovered by its owner. These animals were missing from their range in the spring of 1877.

In the spring of 1877, Harris and Hill were living on a place which was afterwards purchased by the State's witness Etheridge, from Harris. Hill lived and camped around the place, within the distance of a quarter of a mile. In substance, the testimony of the State's witness Etheridge was, that he knew the CRUM cow and yearling, the animals in question, and that, in the summer of 1877, the defendant Harris and Hill had them up, milking the cow and keeping the calf in a pen. Some time

during the year 1877, and while the witness was at Harris's house, a man named Kelsoe came there and claimed the cow, claiming that her brand was R G. Harris claimed that the brand was FORD, the brand he gave. To settle the dispute as to the true brand on the cow, she was thrown down and the hair picked off, which operation disclosed that the brand was CRUM. Thereupon both Harris and Kelsoe disclaimed ownership, and the former said that, to his knowledge, the cow belonged to Crumb. The cow and calf were retained in the service and use of Harris and Hill for some time after this occurrence. Late in 1877, Hill moved from the Harris place to another, some three-quarters of a mile distant, and took both animals with him. Early in 1878, both Harris and Hill moved to the "Martin place," in Comanche county, four or five miles distant, turning the cow and calf out upon the range. The two animals ranged around the place, the old Harris place, for some time afterwards. Witness frequently saw them on that range after Harris and Hill left. After having missed the yearling for some time, it returned to the range, branded $\overline{TH}$ or $\overline{HT}$, the brand given by one Bud Homesley. It had not been branded up to the time Harris and Hill left that place. After that time, both animals ranged around the witness's place, that is, the old Harris place. The witness had never known Harris to claim the cow after he and Kelsoe picked the hair from the brand. Witness could not interpret the brand before it was picked, but afterwards it was perfectly legible. A year or two after the yearling returned to the range, branded in Homesley's brand, Harris penned the cow at witness's place, saying that he penned her for Hutchinson &. Ward. Ward afterwards called and got the cow, and witness learned that he had bought her from Crumb. Defendant told witness that he first got the cow and calf in the spring of 1877, on Pecan Branch, in Brown county. After the yearling returned, with Homesley's brand, the defendant told witness about a mortgage to Dixon & Green, and said he had given Hill the yearlings to satisfy it. He did not mention any given number of yearlings as furnished Hill by him. The animal ranged on the range described. The witness had never seen it off that range, or beyond the limits of Brown county.

In substance, the testimony of the State's witness Martin was that in January or February, 1878, Hill rented his, witness's, place, some four or five miles from the present residence of the witness Etheridge, formerly the Harris place. Harris moved to and lived

on the place with Hill. Harris and Hill brought with them the CRUM cow, and her's among other yearlings. Some three days later Hill sold to Homesley three yearlings, including the yearling of the CRUM cow. The money paid for these yearlings was paid to witness at Hill's request, with direction to liquidate a mortgage held by Dixon & Green on Hill's steers. A short time later Hill moved again, about four miles distant, and took the CRUM cow with him. Hill told the witness that he bought that cow from Crumb's son, and both before and after the sale of the yearling he told witness that he bought the yearling from Harris. Harris was not present at the time of either of these statements.

The charge in the indictment is the theft of "*one certain cattle.*" This embraces either the cow or the calf, but specifically selects neither. It is evident, however, that the conviction was for the theft of the calf; for certainly it will not be contended that the evidence can support a conviction for the theft of the cow. Kelsoe as well as Harris believed the cow to be his property up to the picking of the brand. When this resulted in disclosing the brand to be Crumb's, neither Kelsoe nor Harris continued his claim, but both disclaimed the ownership of the cow, Harris proclaiming the name of the real owner. After the transaction with Homesley, the cow returned to her range around Etheridge's, and was penned by Harris at Etheridge's for Hutchinson & Ward, and Ward came and got her. This was a year or two after the yearling had returned to the Etheridge range, branded in the Homesley brand. The witness Etheridge states: "I learned that he (Ward) had bought her from Crumb." These facts, we think, eliminate the cow from the case.

What are the facts relating to the defendant's connection with the calf? Certainly the same as those relating to his connection with the cow, up to the time of their being penned at Martin's. What criminative fact is disclosed in the transaction with Homesley? There was a mortgage on Hill's steers. The defendant, who was Hill's father-in-law, to satisfy this mortgage, furnished Hill with one yearling and his interest in another, and the defendant and Hill drove the cow and calf in dispute, and penned them at Martin's, and with this calf and the others Hill paid off the mortgage. By this fact, defendant being fully aware that the calf belonged to Crumb, the State seeks to prove a guilty connection of defendant with Hill in taking and dispos-

ing of the calf.   Hill and Harris drove the cow and calf to Martin's, and there penned them.   The calf, with others, was taken to Martin's for Homesley, and by this means the mortgage on Hill's steers was liquidated.

Does the record furnish no explanation of this matter, consistent with Harris's innocence?   Standing alone, and viewed in the light of the fact that Harris knew that the cow and calf were the property of Crumb, the cow being branded in his brand, this matter in relation to the Homesley transaction is very suspicious indeed.   But are not his acts in relation to this transaction explained by his witnesses?   What say they upon this subject— the only serious circumstance against the defendant?

A sister of the defendant testified in his behalf, substantially, that she remembered the cow and calf in controversy, which ranged near the house of Etheridge; that, in February, 1878, Harris was at her house when Hill came there and requested Harris to let him have some yearlings with which to pay the mortgage heretofore spoken of.   After some demur, Harris agreed to let him have one of three he owned, and his interest in one to be furnished by Martin.   With this Hill expressed himself satisfied, saying that he would use, in addition, the calf of the CRUM cow.   This occurred a day or two before the witness heard of the sale of the yearlings to Homesley.   The witness had, on several occasions before this, heard Hill say that he had traded with Crumb's son for the CRUM cow and yearling, and was to pay for them or return them by the first of October.   A few days subsequent to the day on which witness heard of the sale of the yearlings to Homesley, Hill was at her house, and, in the course of a conversation with Harris, Harris told him in witness's hearing that he, Harris, was fearful that he, Hill, would get himself into trouble about the sale of the CRUM yearling.   Finally Harris told Hill that he did not believe that he had ever bought the cow and calf.   Hill again asserted that he had purchased them, and said that he was to pay Crumb eighteen dollars for them by October 1, or return them.   The witness remembered hearing of the picking of the cow's brand by Harris and Kelsoe, and had never heard Harris claim the cow or calf since.   Hill commenced claiming the cow and calf early in the year 1878.

The husband of the last witness testified, for the defense, that he remembered the cow and calf in controversy, and remembered the occasion of the picking of the cow's brand.   After the

picking of that brand Harris had never claimed the cow or calf, nor were they claimed by any one that witness ever heard of until Hill, in 1878, began to claim that he had purchased them from Crumb. Shortly after the sale of the yearling Hill was at the witness's house, and while there had a conversation with Harris, in the course of which Harris told him that he was afraid he, Hill, would get into trouble about the sale of the Crumb yearling; that he, Harris, did not believe that he, Hill, had ever bought the cow and yearling of Crumb. The two parties, Harris and Hill, became excited; Hill called Harris a liar, and the two would have engaged in a fight, but were prevented by the witness. Soon after this, Hill moved away from the Martin place and took the cow with him.

The substance of the testimony of the son of the last two witnesses was that he was present and heard Hill ask help of Harris in paying the mortgage on his steers; that he heard Harris agree to let Hill have one yearling and his interest in another due from Martin to him and Hill, and heard Hill say that, in addition, he would turn in the calf of the Crumb cow.

These facts, sworn to by these witnesses, if true, certainly explain the conduct of the defendant in relation to the Homesley transaction. If Hill had purchased the cow and calf from Crumb, evidently there was nothing criminal in Harris's conduct in assisting him in driving them to Martin's, along with the other yearlings to be delivered to Homesley.

It may be urged by the State that, as the jury had the right to reject the evidence of these witnesses, this may have been done, and that the case should be treated without the evidence. There is no material conflict in the testimony, nor between the theory of the State and that of the defense. Without explanation, the defendant's connection with the Homesley matter is very suspicious. With the explanation made by his witnesses, it ceased to be suspicious or criminal, and is made consistent with the theory of the State and the innocence of the defendant. This being the case, can the jury, without reason, disregard the testimony of his witnesses?

If the defendant, at the time he and Hill penned the yearling at Martin's for Homesley, had stated that Hill claimed that he had purchased the cow and calf from Crumb, and that he, Harris, made no claim to them, would not this statement have been a reasonable explanation of his connection with the cattle? Most evidently, under the circumstances of this case, it would.

This explanation being reasonable, to convict, the State would have been bound to disprove it. Was his connection with, or possession of, the yearling at that time questioned or challenged? There was nothing whatever said by any person relating to his possession of, or claim to, or connection with, the cow or yearling; and it is very doubtful whether he was called upon for an explanation. But, suppose that he was, and failed at that time to give one, certainly he would not be deprived of the right to prove facts clearly showing his innocent connection with the cattle. This, to our minds, he has very satisfactorily done.

But it may be insisted by the State that this proof was made by his relatives. How much stronger the reason, then, why the court should have granted his application for a continuance of the case. The defendant's diligence was ample, and the absent witnesses were not his relations. By these witnesses, he swears in his application, he could prove the same facts sworn to by his relations. It is contended by the State that the facts which he expected to prove by the absent witnesses are not stated, but conclusions. The application states that the defendant expects to prove by the absent witnesses that one Hill, who was convicted upon an indictment for this offense, at the time of and after the alleged theft, claimed, handled and controlled the stolen animal, and that the defendant neither claimed, handled nor controlled the said animal. That Hill *claimed* the animal is certainly a *fact*. The particular acts which constitute handling and controlling an animal would be very hard to enumerate and describe. The rule that facts, and not conclusions, must be stated is a good one, but it must not be construed so as to work an injury to the State or defendant.

We are of the opinion that the cause should have been continued, as this was the first application. We are also of the opinion that the verdict is not sustained by the evidence, and for these reasons the judgment is reversed and the cause remanded.

*Reversed and remanded.*